**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CRIMINAL ACTION NO.** |
| | : | **17-CR-339 (AJN)** |
| **v.** | : | |
| | : | |
| **CHRISTIAN CARDENAS** | : | |
| **Defendant** | : | |

---

**DEFENDANT CHRISTIAN CARDENAS'S SENTENCING MEMORANDUM**

**Justin Levine, Esq.**
**408 East 92nd Street**
**Suite 7A**
**New York, N.Y. 10128**
**917-804-0873**
**Fax: 646-596-7818**
**Email: justlevine@aol.com**

1

## **TABLE OF CONTENTS**

INTRODUCTION………………………………………………………....3

I.      PROCEDURAL HISTORY…………………………………………..4

II.     CHRIS'S PERSONAL BACKGROUND…………………………....5

III.    CHRIS'S SUBSTANCE ABUSE…………………………………….6

IV.     LETTERS OF SUPPORT FROM FAMILY AND FRIENDS..……….8

V.      OFFENSE CONDUCT……………………………………………..9

VI.     SENTENCING……………………………………………………...10

        1.   Overview of sentencing factors…………………………………...11

        2.   History and characteristics of defendant……………………….12

        3.   Nature of offense……………………………………………….12

        4.   Advisory Sentencing Guidelines and Commission Policy…………...13

        5.   Avoidance of Unwarranted Sentencing Disparities…………………15

        6.   A sentence of 60 months fulfills the goals of sentencing……………17

VI.     CONCLUSION……………………………………………………..18

## **TABLE OF AUTHORITIES**

*Kimbrough v. United States*,
552 U.S. 85 (2007)........................................................................................................................1

*Nelson v. United States*,
555 U.S. 350 (2009) (per curiam)................................................................................................1

*United States v. Adelson*,
441 F. Supp. 2d 506 (S.D.N.Y. 2006) (JSR)................................................................................1

*United States v. Davis*,
No. 15-CR-382, 2017 WL 3769216 (E.D.N.Y. Aug. 29, 2017)…………………………....…15

Defendant Christian Cardenas, through his counsel, respectfully submits this sentencing memorandum to assist the Court in determining an appropriate sentence.  The indictment in this case charged Chris with conspiracy to distribute and possess with intent to distribute one kilogram or more of mixtures and substances containing a detectable amount of heroin and other mixtures or substances containing cocaine and fentanyl.  On March 16, 2018, pursuant to a plea agreement with the government, Chris entered a guilty plea to a lesser-included offense of conspiracy to distribute and possess with intent to distribute 100 grams or more of mixtures and substances containing a detectable amount of heroin in violation of 21 U.S.C. § 841(b)(1)(B).  Chris acknowledges that the use of heroin he distributed resulted in the serious bodily injury of an individual who overdosed after taking the drug.  The plea agreement sets forth a stipulated United States Sentencing Guidelines range of 87 to 108 months' imprisonment, based on (1) a base offense level of 30 and a three-level reduction for acceptance of responsibility to 27, and (2) a criminal history level of III.  The pre-sentence investigation report prepared by the United States Probation Department (the "PSR") calculated the Guidelines range to be 210 to 262 months' imprisonment by alleging that Chris's base offense level is 35 (considerably more than the level stipulated in Chris's plea agreement) and his criminal history level is III.   The PSR recommended 108 months' imprisonment plus four years' supervised probation.  Nevertheless, under either Guidelines calculation, and for the reasons discussed herein, Chris pleads for the leniency of the Court and requests that the Court impose the mandatory minimum sentence of 60 months, which is a sentence sufficient but no longer than necessary to achieve all the relevant goals of sentencing.

I.      **Procedural History**

Chris was indicted on May 31, 2017, charged with conspiring to distribute and possess with the intention to distribute over one kilogram of heroin, and smaller quantities of crack cocaine, fentanyl and cocaine, in Rockland County, New York and elsewhere, between approximately 2012 and 2017, in violation of 21 U.S.C.§§ 841(b)(1)(A) and (B). The indictment further charged that heroin distributed by Chris resulted in serious bodily injury to a victim who overdosed after using the drug.  Chris was arrested on June 8, 2017 and has been in custody since his arrest.

On March 16, 2018, pursuant to a plea agreement with the government, Chris pleaded guilty.  As described in the plea agreement, the government agreed to permit Chris to plead to the lesser-included conspiracy to distribute and possess with intent to distribute over 100 grams of substances containing heroin in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B). This charge carries a minimum term of 5 years' imprisonment.  As contained in the plea agreement, and as discussed further below, the parties believe that Chris's advisory Sentencing Guidelines range is 87 to 108 months' imprisonment, with a mandatory minimum term of 60 months' imprisonment. The plea agreement specifically permits the parties to seek sentences outside the stipulated Sentencing Guidelines range based on the factors contained in 18 U.S.C. § 3553(a).  The PSR sets forth a Sentencing Guidelines range of 210 to 262 months, based on a base offense level of 38, a total offense level of 35 and a criminal history category of III.  PSR ¶ 74.  The Probation Department's Guidelines calculation differs from the plea agreement because it alleges that Chris's base offense level is 38, eight levels higher than in the plea agreement.  Chris's sentencing is scheduled for August 6, 2018.

## II.     Chris's Personal Background

Chris was born on September 6, 1975, in Queens County, New York, to the marital union of Emelio LNU and Edith Salas. Chris has no siblings.  His father never lived with him, and he knows nothing of his father.  He stated that growing up, he would "see a man come to the home" during family gatherings.  Chris did not know who this

person was until the age of seven, when this individual was forbtdden to come into contact with Chris's family. At this time, Chris learned that the man was his father. Chris's father had "touched" a female teenaged cousin, but Chris does not know specifically what occurred.

Chris was raised by his mother and grandmother in Astoria.  His last name is his grandmother's surname. Chris's mother did not wish to give him his father's name or her name, as Chris' mother was abandoned by her father.

This was not the only tragedy Chris experienced during his childhood.  When Chris was nine years old, his grandmother was making dinner on a hotplate. The home was being painted, and flammable vapors ignited, ravaging the entire apartment building by fire. Chris's grandmother, who was 74 years old, died in the fire. Chris and his mother were not home at the time of the fire. Chris and his mother lived briefly with an aunt after the fire, but eventually secured their own residence in Astoria.

Chris's mother worked as a cleaning lady. He was a latchkey child and would often come home from school to an empty house with prepared meals.  He was raised in the Catholic faith.  Chris was lonely as a child and wished he had had a father. He gets along well with his mother, and she is aware of his case.

Chris attended Long Island City High School but dropped out before finishing ninth grade.  Chris has limited reading skills but hopes to take the GED class at the MDC.

Chris married Mina Goumelos in 2010 in Manhattan. His wife is a 42-year-old former receptionist who has not worked in seven years due to severe depression.  She is under the care of a psychiatrist. and is prescribed anti-depressants. She is currently attempting to obtain disability status, and she receives food stamps.

Chris's marriage produced one child, Aristea, age six.  Because of his wife's disability, Chris was the primary caregiver for both his wife and daughter before his incarceration.  Aristea lives with her mother and Chris's mother at 20-58 29th Street, 3d Floor, Astoria, New York. Chris's family recently moved to this address, and Chris has never lived here.  Chris's family is in a precarious position because of his role as caregiver and principal earner.  Regarding Chris' future residential plans, he has apologized to his wife for his serious mistake, and his wife has assured him that she is completely in his corner and that they will keep their family together.   His wife also stated during an interview with the probation department that Chris is a "great father, husband and person" who would "give you the shirt off his back."  Chris reported that until his instant arrest, he had lived with his wife, child and mother at 20-66 29th Street, 3rd Floor, Astoria, New York.

### III.  Chris's Substance Abuse

As Chris candidly admitted to the Probation Department, he has suffered from a series of addictions that began during childhood and has persisted for 30 of his 42 years.

These addictions are described in the following chart:

6

|  | Period of Use | Intensity |
|---|---|---|
| Marijuana | 1988 to 2016 | "four times per year" |
| Cocaine | 1990 to 2017 | "monthly" |
| **MDMA** | In his 20s | A few occasions |
| PCP | 1996 | Defendant believes somebody laced his marihuana |
| Alcohol | 1989 until instant arrest | Heavy use for past 8 years |

Chris disclosed that he was mandated at age 14 to attend a substance abuse treatment program by the courts in Queens County, but he failed to complete the program due to his continued addictions. Subsequently, he repeatedly attempted to join rehabilitation programs. He took a drug education program at the MDC a few months ago. Chris expressed interest in obtaining treatment in the future. The PSR recognizes that substance abuse dependence is a reason for sentencing him below the guideline range.

### IV.  Letters of Support From Family and Friends

Attached to this memorandum are six letters describing Chris's compassionate and caring nature. One letter is from his wife, Mina, who wrote:

> Christian Cardenas is not only an amazing husband, but the best father any little girl can ask for. Our daughter cries and asks for him every day, constantly. Christian and our little girl were inseparable, especially due to the fact that I can't do much cause of my depression and anxiety/panic disorders. I have been suffering since my late teens with this and I am currently 42. Christian did it all for us! He helped with our baby girl more than anyone could. He helped her by taking her and picking her up from school. He took both her and I to all our doctors' appointments. He did all the food and home shoppings as I can't do anything alone. Christian is the type of man that would literally sacrifice all for his family. We are a good family. I am in and out of doctors and hospitals due to my illness and I don't know what I will do from now until his return back home. He was literally super-husband, super-dad! He is also an amazing son to his mother and helped her out a lot as she is 75 now and has some neurological tremor condition. We all depend on Christian and need him home as soon as possible and more importantly safe. Christian is loved and respected by all. His character lightens up any room he walks into. His personality is funny, outgoing and always loves to help others before he would even consider himself. Currently I am with our 6 year old little girl and we have been suffering bad. I cannot work due to my disability, more so, it's been a battle handling everything for my little one, as she has missed a lot of school due to her being sick with bad viruses this winter, which have been brutal. I cannot do much your honor. Christian is our life, he understands the mistake he has made, but we are asking you please take this in consideration upon his sentencing. I cry day in and day out have lost over 40 pounds being sick from all this stress. He is not a "BAD GUY". He's an amazing son, husband, and father. Also, a great friend loved by all. Our years together have been amazing and I wouldn't event ask for a better person to start my life and family with. This is why he is our rock and wish he is always healthy, and safe.

Another letter is from Chris's father-in-law, who wrote:

> I have known Christian now over 15 years and what a blessing. Not only is he an amazing human being, but he's an outstanding husband and an even better father to our beautiful granddaughter. Christian is a very well determined, hard working family man who did it all for his family. He helped my daughter so much especially with her disability with depression and bad stress disorders. He was both mom and Dad. My daughter and his child depend on him so much. He is loved by all. He would literally give his last dollar and his shirt off his back to anyone. We understand Christian was involved in a bad situation which took him away from his family, and this is very sad and hard to believe. We love Christian more like he's our own child. He has been there for myself, my sick wife and our entire family all the time. My daughter Asimina Gournelos needs her husband, she needs his love and support as she cannot do this alone with her daughter. He would get up take the baby to school, pick her up, take his wife to all medical appointments, and always left himself last and behind. As long as they were ok, he was ok. He has high blood pressure which is pretty dangerous, we would all push him to go and take care of himself, and he would always state "I'm ok Mr. Gournelos don't worry about me."

Four additional letters are from (1) Jacqueline Natalizio, Chris's goddaughter and a human resources recruiter for a New York firm; (2) Eugenia Rodamis, Executive Director of Mushroom House Day Care LLC; (3) George Lani, a college student training to become a radiologist; (4) Ingrid Natalizio, a family friend. All of these letters describe Chris as a devoted husband and father who is genuinely remorseful for his actions. Jacqueline Natalizio letter ("Uncle Chris has been nothing but generous, kindhearted and dependable. He is a true family man that always placed his loved ones before himself. Uncle Chris simply wants everyone he loves to feel happy, relaxed and secured. He never wanted his family to feel any worry or apprehension. The happiness and joy of his family was always what was most significant to him"); Rodamis letter (Chris "is truly an exceptional father and husband. I vouch for his character and kindhearted nature"); Lani letter (Chris is "an amazing individual" and a "great father and loving husband" with a "heart of gold"); Ingrid Natalizio letter (Chris is a "good man with a kind heart" who is "truly sorry for his actions").

## V.     Offense Conduct

Chris trafficked heroin in Rockland County, New York, as well as in the Bronx,

Queens County, Brooklyn, and Manhattan. His role was that of a supplier. He supplied Robert Diaz, among others, with drugs for resale.

Chris takes full responsibility for his actions and in no way seeks to minimize any aspect of his conduct.  Chris is beside himself with remorse that the drugs that were either directly or indirectly sold to Victim-1 resulted in his overdose.  It cannot be stated strongly enough that Chris never intended for anyone to suffer serious bodily injury, including Victim-1. To the contrary, Chris and Victim-1 were good friends, and Chris saved Victim-1's life after Victim-1 consumed this heroin on December 15, 2016.  On that evening, Chris stopped by Victim-1's residence to see how Victim-1 was doing.  Chris knocked on the door but heard no answer.  He put his ear to the door and heard heavy gasping.  Alarmed, Chris entered the residence and found Victim-1 naked on a chair, barely alive.  Chris contacted emergency personnel, who administered Narcan to Victim-1 to save his life.  The emergency responders told Chris that Victim-1 would have died within minutes had Chris not contacted them.

**VI.    Sentencing**

The parties agreed to a stipulated advisory Guidelines calculation in the plea agreement. The advisory Sentencing Guidelines calculation agreed to by the parties calculates Chris's total offense level at 30, which the government agrees to reduce by three levels upon acceptance of responsibility, and a criminal history category of III, resulting in the advisory Guidelines range of 87 to 108 months. Pursuant to the plea agreement, the parties are precluded from seeking, and Chris does not seek now, downward departures or adjustments from this stipulated range, but Chris is explicitly permitted to seek variances from the stipulated Guidelines range based on the balance of section 3553(a) factors.

The PSR differs from the stipulated Guidelines range by setting Chris's total offense

level at 38, with a three-level reduction to 35 for acceptance of responsibility.  The PSR claims that this offense level results from the serious bodily injury caused to Victim-1.

Whichever calculation of the Guidelines the Court endorses, the Court must of course impose a sentence sufficient, but not greater than necessary, to achieve the objectives of sentencing. 18 U.S.C. § 3553(a); *see Kimbrough v. United States*, 552 U.S. 85, 89 (2007); *Gall v. United States*, 552 U.S. 38, 54-57 (2007).   Chris respectfully submits that in his case, the mandatory minimum sentence of 60 months' imprisonment is sufficient, but not greater than necessary to achieve the objectives of sentencing, and requests that the Court impose that sentence.

### 1.    Overview of Sentencing Factors

The goals of sentencing as set forth in section 3553(a)(2) are:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2).  In making an individualized assessment necessary to meet the goals of sentencing, the Court must contemplate, consider, and give appropriate weight to the following factors, pursuant to section 3553(a): (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (3) the kinds of sentences available; (4-5) the applicable sentencing Guideline range and Sentencing Commission (the "Commission") policy statements; (6) the need to avoid unwarranted sentencing disparities among defendants who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the

offense. *See* 18 U.S.C. § 3553(a)(l)-(7).  These factors in concert show that a sentence sufficient, but not greater than necessary, to meet all the sentencing goals of section 3553(a)(2) is substantially below the advisory Guidelines range, and that the statutory minimum sentence of 60 months addresses each of the statutory sentencing goals.

### 2.  History and Characteristics of the Defendant

Chris's early introduction to drugs and alcohol, coupled with tragedies in his childhood, set him on the path of recurrent drug use and deepening addiction, to which the offence conduct is inextricably linked.  Having been introduced to marijuana and alcohol in elementary school, drug and alcohol use was unfortunately normalized for Chris at a very young age.

Chris knows that he faces substantial time in prison.  His decision to plead guilty represents his whole-hearted acceptance of responsibility for his behavior and its consequences. Having done so, his thoughts are turned towards making productive use of his custodial sentence to prepare for the future once he is released.  Chris hopes and expects that his time in prison will be what it takes to finally defeat his addictions, and he looks forward to taking full advantage of drug treatment programs at his designated facility.  Chris knows that overcoming his addictions will allow him to pursue gainful employment when ultimately he is released.  Chris is grateful for the support of his wife, family, including his mother and father-in-law, and his friends.  *See* attached letters.

### 3.  Nature and Circumstances of Offense

Chris has pleaded guilty to a serious crime, one which led to the overdose of another drug user.  Chris takes full responsibility for his actions and in no way seeks to minimize any aspect of his conduct.  There is no denying that Chris was aware of the danger heroin posed, but he did not intend to harm any of his customers, many of whom he considered his friends, and he did not

intend to harm Victim-1.

In determining the appropriate sentence, the Court should consider the context and circumstances surrounding the serious bodily injury at issue – that is, the drug overdose of Victim 1 in December 2016.  Without minimizing the seriousness of Victim 1's overdose, the fact of the overdose itself and the circumstances that led to it do not indicate any unusually egregious conduct by Chris.  There is no indication whatsoever of any intent to harm Victim-1 or indifference to the results of the victim's using the heroin. To the contrary, Chris discovered Victim-1 near death after the overdose and saved his life by contacting emergency responders. Moreover, the evidence does not indicate anything uncommon about the particular heroin he provided Victim-1. Rather, the medical records here indicate that the victim used not only heroin but also benzodiazepines (*i.e.*, Xanax) and cocaine – drugs that he did *not* receive from Chris – which contributed to his overdose. Excerpts of Victim 1's medical records, Exhibit A (under seal), at US_001262 (clinical impression showing diagnosis of benzodiazepine overdose in addition to opioid overdose), US_001268 (discharge summary stating "Urine tox positive for benzo, opiates, cocaine"), and US_001496 (laboratory results showing urine positive for benzodiazepines, cocaine and opiates). Opiates and benzodiazepines, which both suppress breathing, can be a particularly lethal combination.[1]  Here, Victim 1 thankfully survived this overdose.

### 4.  Advisory Sentencing Guidelines and Commission Policy

In connection with sentencing, the Court first must independently determine the advisory

---

[1] *See, e.g.*, National Institute on Drug Abuse, *Benzodiazepines and Opioids* (March 2018), *available at* https://www.drugabuse.gov/drugs-abuse/opioids/benzodiazepines-opioids (stating that more than 30% of overdoses involving opiates also involve benzodiazepines); https://www.drugabuse.gov/related-topics/trends- statistics/overdose-death-rates, note 2 (showing a 5-fold increase in the number of deaths involving both benzodiazepine and heroin between 2002 and 2015).

Sentencing Guidelines range. While the Court is required to consider the advisory Guidelines range, together with other sentencing factors, it may not presume that the advisory Guideline range is reasonable. *See Gall*, 552 U.S. at 49-50; *Nelson v. United States*, 555 U.S. 350, 351-52 (2009) (per curiam) ("The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable.") (emphasis in original); *United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006) ("where, as here, the calculations under the Guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who   will bear the consequences.").

As set forth in the plea agreement, the parties stipulated that the applicable Guidelines range was 87 to 108 months' imprisonment, based on (1) a base offense level of 30 and a three-level reduction for acceptance of responsibility to 27, and (2) a criminal history level of III.  The Probation Department calculated the Guidelines range to be 210 to 262 months' imprisonment by alleging that Chris's base offense level is 38 (considerably more than the level stipulated in Chris's plea agreement) and his criminal history level is III.  We respectfully submit that the range stipulated between the parties, 87-108 months, is an appropriate starting point from which to consider additional factors favoring a variance to the mandatory minimum 60 months, as discussed further below.  In addition, the Court should also consider in gauging a downward variance that Chris's criminal history category of III overstates the seriousness of his criminal history.  All of Chris's four convictions were for non-violent offenses — either driving under the influence, possession of controlled substances, or attempted sale of controlled substance.  Two of the four convictions are over twenty years old and therefore cannot count against him for

criminal history purposes under Sentencing Guideline 4A1.2(e)(3).  A third is twelve years old.

Either the Guidelines calculation in the plea agreement or the PSR will result in a substantially longer than necessary sentence here, and accordingly, would run afoul of the fundamental sentencing objectives codified in Section 3553(a). The defense submits that Chris's non-violent criminal history, in conjunction with his personal background and characteristics and the circumstances of the instant offense conduct, warrant a substantial variance downward from the Guidelines range.

**5.  Avoidance of Unwarranted Sentencing Disparities**

A downward variance to the mandatory minimum of 60 months' imprisonment would not create inordinate sentencing disparities.

As is the case with Chris, substance abuse dependent defendants convicted of narcotics distribution conspiracies routinely receive sentences below the Guidelines range.  For example, in *United States v. Davis,* the defendant suffered a long history of substance abuse dependency and criminal convictions and pleaded guilty to a narcotics distribution conspiracy under 21 U.S.C. §§ 841(b)(1)(C) and 846. No. 15-CR-382, 2017 WL 3769216 (E.D.N.Y. Aug. 29, 2017) (Weinstein, J.). The court recognized that "the defendant's addiction is responsible for much of his illicit conduct" and sentenced him to *less than half* of the low end of his Guidelines range. *Id.* at *3 (sentencing defendant to 60 months in custody in light of Guidelines of 130-162 months).

Nor would a below-Guidelines sentence create disparities with other sentences where bodily harm of another resulted from the defendant's sale of narcotics. In another case prosecuted in this District, *United States v. Williams*, the defendant pled guilty to a narcotics distribution conspiracy under 21 U.S.C. §§ 841(b)(1)(A) and 846 for distributing "*heroin and fentanyl that resulted in multiple victims suffering death and/or serious bodily injury.*"

16

Government's Sentencing Letter, No. 16-cr-00464-NSR, ECF No. 38, at 1 (S.D.N.Y. filed Feb. 9, 2017) (emphasis in original).   The Government and Williams further "stipulated that a dangerous weapon was possessed (based on the two loaded firearms recovered from his residence), and that the defendant was an organizer, leader, manager, or supervisor of the conspiracy." *Id.* at 2. Even so, Williams was sentenced to 144 months, less than the advisory Guidelines range of 151-188 months. *Id.* at 1; Sentencing Hearing, No. 16-cr-00464-NSR (Feb. 10, 2017).  By comparison with the defendant in *Williams*, therefore, a sentence for Chris — who did not possess firearms in furtherance of the conspiracy or supervise any member of the conspiracy — below the Guidelines and below the Probation Department's recommendation would be consistent with other sentences where serious bodily injury resulted from narcotics distribution.

Lastly, a sentence below the stipulated guidelines in the plea agreement would not create any sentencing disparities with the other defendants in this case, four of whom have been sentenced to date, and all of whom received below-Guidelines sentences.  To elaborate:

1. Theresa Keefe, Robert Diaz's partner in the narcotics conspiracy, pleaded to a violation of 21 U.S.C. § 841(b)(1)(C) and stipulated in a plea agreement to a Guideline range of 46-57 months' imprisonment.  *See* Government's Sentencing Letter, ECF No. 158, at 1 (filed May 1, 2018). The Probation Department calculated her Guidelines range to be 70-87 months' imprisonment but recommended a sentence of 36 months' imprisonment. *Id.*  Ms. Keefe ultimately received a sentence of 40 months' imprisonment. *See* Judgment, ECF No. 160 (filed May 4, 2018).

2. Ronald Bolanos, another co-defendant, pleaded to a conspiracy to distribute narcotics in violation of 21 U.S.C. § 841(b)(1)(B) and stipulated to a Guidelines range of 100-125 months'

imprisonment.  *See* Government's Sentencing Letter, ECF No. 177, at 3 (filed June 14, 2018).

The Probation Department calculated his Guidelines range to be 130-162 months' imprisonment

but recommended a sentence of 96 months' imprisonment.  *Id.*  Mr. Boanlos ultimately received

a sentence of 80 months' imprisonment. *See* Judgment, ECF No. 187 (filed June 21, 2018).

    3.   Pablo Perez, another co-defendant, pleaded guilty to a conspiracy to distribute

narcotics in violation of 21 U.S.C. § 841(b)(1)(B) and stipulated to a Guidelines range of 188-

235 months' imprisonment.  *See* Government's Sentencing Submission, ECF No. 189, at 4 (filed

June 24, 2018).   The Probation Department recommended a sentence of 96 months'

imprisonment.  *Id.*  Mr. Perez ultimately received a sentence of 90 months' imprisonment. *See*

Judgment, ECF No. 194 (filed June 28, 2018).

    4.  Most recently, Robert Diaz pleaded to a conspiracy to distribute narcotics in violation

of 21 U.S.C. § 841(b)(1)(B) and stipulated to a Guidelines range of months' imprisonment of

188 to 235 months' imprisonment. The Probation Department calculated the Guidelines range to

be 262 to 327 months' imprisonment.  Mr. Diaz was sentenced to 120 months' imprisonment.

    **6.    A Sentence of 60 months fulfills the goals of sentencing.**

    The Court must ensure that Chris's sentence meets the goals of sentencing, as set forth in

18 U.S.C. § 3553(a)(2)(A)-(D).  In particular, § 3553(a)(2)(B) provides that the sentence should

"afford adequate deterrence to criminal conduct" and § 3553(a)(2)(C) provides that the sentence

should "protect the public from further crimes of the defendant[.]"  Chris is determined to beat

his addiction and never return to prison. He has never before faced a sentence of the magnitude

of even the mandatory minimum sentence, let alone the stipulated Guidelines range. Facing the

possibility of such a sentence at age 43 has brought Chris to the realization that he could die in

prison, never to see his family as a free man again. This jolting prospect is the greatest deterrent

of any future illegal behavior, should Chris be given the chance.

In five years, Chris will be 48 years old. This age is significant because the Commission has found offenders who are 51 or older at the time of release have a lower recidivism rate than any other age bracket, other than those released when they are younger than 21. United States Sentencing Commission, *Recidivism Among Federal Offenders: A Comparative Overview*, at 23 (Mar. 2016).  Chris will be quite close to 51 in five years, yet at that time, Chris would still be able to return to the work force with many productive years ahead of him.  Conversely, a sentence within the advisory guideline range or the PSR would result in Chris's release at an age when it would be far more difficult to find employment and the stability that regular work would bring, which we submit would be critical to Chris maintaining sobriety. Chris's prospective ability to find work upon release after 60 months provides added deterrence from criminal conduct. Consequently, a sentence well-below the Guidelines range will accomplish the goal of specific deterrence.

A sentence of 60 months is also more than adequate to provide Chris the substance abuse treatment he needs, as BOP's RDAP program typically lasts 9-12 months. *See* 18 U.S.C. § 3553(a)(2)(D).

Moreover, a sentence of 60 months is a lengthy period of time that reflects the gravity of the offense and promotes respect for the law.

## V.    Conclusion

Chris has pleaded guilty to a serious crime and he accepts responsibility for the consequences of his actions. He knows that no matter what sentence he receives, he faces a substantial amount of time in prison. However, a just punishment is one that accounts fully for the circumstances that led Chris to Your Honor's courtroom and recognizes that the advisory

Sentencing Guidelines overstate what an appropriate punishment for Chris would be. Up to this point, Chris has had a life-long struggle with addiction. Even so, he recognizes that his own poor choices have caused another serious harm and oblige him to remain in custody at least until he has served 60 months. Chris intends to use those 60 months to put his substance abuse squarely in the past so he can focus on his future.  Accordingly, for all the foregoing reasons, Chris seeks the Court's wisdom and mercy and asks for an opportunity to re-establish a law-abiding life and a meaningful relationship with his now young-adult sons as soon as the law will allow by sentencing him to the mandatory minimum term of imprisonment of 60 months.

Respectfully submitted:

/s/ Justin Levine
Justin Levine
408 East 92nd Street
Suite 7A
New York, N.Y. 10128
917-804-0873

Attorney for Christian Cardenas